## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL SEIBERT,** | : | **Civil No. 1:18-CV-10** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **ANDREW SAUL,** | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

### I.      Introduction

It is a cardinal principle of judicial review in Social Security appeals that "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)). The instant case aptly illustrates this principle.

The plaintiff, Michael Seibert, suffers from a cascading array of medical impairments, including morbid obesity, diabetes, and degenerative disc disease. As a result of these impairments, Seibert experiences neuropathy in his legs, suffers from edema, or swelling, of his legs, and is afflicted with circulatory problems in his legs marked by insufficient blood flow and deep vein thrombosis. These medical

complications are well-documented and longstanding. Moreover, both Seibert and his treating physician, Dr. Orange, have stated that it is necessary for Seibert to elevate his legs above his heart while at work for more than half the work day due to these impairments. Furthermore, in Seibert's case, a vocational expert has also testified that if Seibert must elevate his legs for 60% of the work day due to his edema and venous insufficiency, he is essentially unemployable.

Despite this uncontested evidence that Seibert was medically required to engage in postural limitations that may render him disabled, the ALJ found that Seibert could perform a range of light work without any significant postural restrictions. In reaching this conclusion, the ALJ failed to address, analyze, or acknowledge this evidence supporting the medical necessity of Seibert being able to raise his legs above the level of his heart for prolonged periods during the work day. Mindful of the fact that an ALJ "cannot reject evidence for no reason or for the wrong reason," Mason, 994 F.2d at 1066, and recognizing that courts have frequently found that the failure to address such medically-required postural limitations calls for a remand,[1] for the reasons discussed below, we conclude that

---

[1] See e.g., Dillon v. Colvin, 210 F. Supp. 3d 1198, 1212 (D.S.D. 2016); Mills v. Colvin, 959 F. Supp. 2d 1079, 1094 (N.D. Ill. 2013); Melendez v. Astrue, 630 F. Supp. 2d 308, 315 (S.D.N.Y. 2009); Lawson v. Barnhart, 218 F. Supp. 2d 967, 972 (N.D. Ill. 2002).

this failure of articulation in the instant case compels a remand for further consideration of this case by the Commissioner.

## II.    <u>Statement of Facts and of the Case</u>

On February 2, 2015, Michael Seibert applied for disability benefits pursuant to Title II of the Social Security Act. Six months later, on August 18, 2015, Seibert also applied for supplemental security income benefits pursuant to Title II of the Social Security Act. (Tr. 13.) In these applications, Seibert alleged that he had become totally disabled on April 29, 2014, due to the combined effects of obesity, diabetes, neuropathy, sleep apnea, hypertension, degenerative disc disease, and anxiety. (Tr. 15.) Seibert was 39 years old at the time of the alleged onset of his disability, had a high school education, and had prior employment as a forklift operator and warehouse worker. (Tr. 21.)

Together, Seibert's impairments imposed a series of significant limitations upon the plaintiff. At the outset, Seibert suffered from morbid obesity. He was approximately 5 feet 9 inches tall and his weight fluctuated between 370 and 400 pounds. (Tr. 18-19, 275, 278.) As a result, Seibert had a body mass index, or BMI, which hovered between 57 and 59, placing him in the category of extreme obesity. (<u>Id.</u>) Seibert also suffered from diabetes and experienced diabetic neuropathy as a

result of this condition. Moreover, these medical impairments contributed to Seibert's degenerative disc disease, exacerbating that condition as well.

These medical conditions manifested themselves in a number of significant ways that limited Seibert's use of his legs and frequently required him to elevate his legs above the level of his heart to obtain relief from pain and numbness. The existence of these underlying medical conditions is entirely undisputed on this record. For example, Seibert's medical history was replete with notations that he suffered from deep vein thrombosis, the formation of blood clots in the deep veins of his legs, and experienced edema or swelling of his legs. (Tr. 283, 285, 440, 301, 304, 305, 336, 337, 338, 341, 345, 349, 350, 372, 373, 377, 378.) Seibert also suffered from neuropathy and had diminished sensation in his legs. (Tr. 302, 306, 339, 343, 344, 347, 348, 351, 352, 375, 380.)

These impairments were not only reflected in Seibert's treatment records, they were also independently found by Dr. Spencer Long, a consultative examining physician who conducted an examination of Seibert on May 26, 2015. (Tr. 283-94.) Dr. Long's examination report confirmed Seibert's obesity, ankle edema, and venous insufficiency. (Id.) Dr. Long also reported that, as a result of these impairments, Seibert was limited to standing for 10 minutes at a time and could stand for no more than 30 minutes during a work day. Further, Dr. Long found that Seibert

could only walk for 5 minutes at a time for a total of 30 minutes of walking during a work day. (Tr. 288.) Thus, the limitations found by Dr. Long would have restricted Seibert to work that entailed prolonged sitting.

Seibert's treating physician, Dr. Paul Orange, confirmed that Seibert was severely limited in his ability to stand or walk during the work day and imposed additional medical limitations upon Seibert when seated at work. According to Dr. Orange, in order to address this edema, neuropathy and venous insufficiency during an 8-hour work day, Seibert would have to be seated with his legs elevated above his heart for at least 60% of the day. (Tr. 529.) At his February 21, 2017 disability hearing before the ALJ, Seibert also testified that he was required to frequently elevate his legs and feet throughout the day to combat the "burning sensation and numbness going up through my legs." (Tr. 36.)

The transcript of this disability hearing also reveals that it was clearly recognized that this neuropathy, leg pain, edema, and Seibert's need to elevate his legs above the level of his heart would significantly impair his ability to find and maintain work. In fact, in response to a question posed by counsel to the vocational expert who testified at this hearing concerning whether Seibert could still work if he needed to have his legs elevated above heart level for 60% of the day, the vocational

expert testified that a person who experienced these restrictions at work could not obtain employment. (Tr. 47.)

It was against this medical backdrop that the ALJ held a hearing on Seibert's disability application on February 21, 2017. (Tr. 29-48.) Following this hearing, on May 10, 2017, the ALJ issued a decision denying Seibert's application for benefits. (Tr. 10-23.) In that decision, the ALJ first concluded that Seibert met the insured status requirements of the Social Security Act through December 31, 2016 and had not engaged in any substantial gainful activity since his alleged onset date of disability on April 29, 2014. (Tr. 15.) At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Seibert's obesity, diabetes, neuropathy, sleep apnea, hypertension, degenerative disc disease, and anxiety were severe impairments. (Tr. 15.) Having made this Step 2 determination, at Step 3 the ALJ concluded that none of Seibert's impairments met or medically equaled the severity of one of the listed impairments. (Tr. 16-17.)

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for Seibert which found that he could perform a range of light work. (Tr. 17.) Notably, this residual functional capacity assessment did not account for the well-documented need for Seibert to elevate his legs above the level of his heart for much of the work day. In fact, the ALJ's decision did not analyze, address or

acknowledge this work-preclusive restriction on Seibert's activities, a restriction which was consistent with Seibert's medical history, was specifically identified by Seibert's treating physician, and was confirmed by Seibert.

Having arrived at this residual functional capacity (RFC) assessment for Seibert, the ALJ found at Step 4 that he could not do his past warehouse work but concluded at Step 5 there were other jobs in the national economy which he could perform. (Tr. 21-23.) Accordingly, the ALJ concluded that Seibert did not meet the stringent standard for disability set by the Act and denied this disability claim. (Id.)

This appeal followed. (Doc. 1.) On appeal, Seibert challenges the ALJ's analysis on several grounds, in particular arguing that the ALJ's failure to address or acknowledge in any fashion the plaintiff's need to elevate his feet over the level of his heart for more than half of the work day in order to combat his edema, neuropathy and venous insufficiency created an evidentiary deficit which calls for a remand since we cannot ascertain whether this evidence was rejected "for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993). This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we conclude that this failure of articulation in the instant case calls for a remand for further consideration of this evidence by the Commissioner.

### III.    Discussion

#### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."  Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence.")(alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable

meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

On this score one other rule applies. When evaluating the legal sufficiency of an ALJ decision it is axiomatic that that "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). Accordingly, we should remand for further consideration whenever the record reveals that evidence was discounted by the ALJ for the wrong reason or no reason.

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic

view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings, 129 F. Supp. 3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work

experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999). Finally, it is clear that "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).

## C.    A Remand is Appropriate in this Case

Judged by these legal benchmarks, we conclude that a remand is appropriate in the instant case. We reach this conclusion mindful of the fact that meaningful judicial review requires that the ALJ adequately articulate the basis for a disability finding, a task which includes two elements: an ALJ "cannot reject evidence for no reason or for the wrong reason." Mason, 994 F.2d at 1066.

In this case, it appears that the ALJ's decision did not fully comply with these legal directions. In our view, this analysis was incomplete in one significant respect. It did not address or even acknowledge the substantial evidence indicating that Seibert needed to elevate his legs above the height of his heart for prolonged periods during the work day, a postural limitation that the vocational expert described as a complete barrier to employment.

With respect to this medical limitation, there was substantial evidence in the record that called for some consideration of this particular impairment. At the outset, Seibert's medical history was replete with notations that he suffered from deep vein thrombosis, the formation of blood clots in the deep veins of his legs; experienced edema or swelling of his legs;[2] suffered from neuropathy and had diminished

---

[2] Tr. 283, 285, 440, 301, 304, 305, 336, 337, 338, 341, 345, 349, 350, 372, 373, 377, 378.

sensation in his legs.[3] In fact, these impairments were specifically confirmed by the consultative examining source in this case, Dr. Spencer Long, who conducted an examination of Seibert on May 26, 2015 and confirmed Seibert's obesity, ankle edema, and venous insufficiency.[4] Dr. Long also reported that, as a result of these impairments, Seibert was limited to standing for 10 minutes at a time and could stand for no more than 30 minutes during a work day. Further, according to Dr. Long, Seibert could only walk for 5 minutes at a time for a total of 30 minutes of walking during a work day. (Tr. 288.) The limitations found by Dr. Long, therefore, would have restricted Seibert to work which entailed prolonged sitting.

Seibert's treating physician, Dr. Paul Orange, confirmed that Seibert was severely limited in his ability to stand or walk during the work day and imposed additional medical limitations upon Seibert when seated at work. According to Dr. Orange, due to his edema, neuropathy and venous insufficiency, during an 8-hour work day Seibert would have to be seated with his legs elevated above the level of his heart for at least 60% of the day. (Tr. 529.) Seibert also confirmed that he was required to frequently elevate his legs and feet throughout the day to combat the "burning sensation and numbness going up through my legs." (Tr. 36.) Moreover, it

---

[3] Tr. 302, 306, 339, 343, 344, 347, 348, 351, 352, 375, 380.
[4] Tr. 283-94.

was clearly recognized that this neuropathy, leg pain, edema, and Seibert's need to elevate his legs over his heart for more than half of a work day would significantly impair his ability to find and maintain work. In fact, in response to a question concerning whether Seibert could still work if he needed to have his legs elevated above heart level for 60% of the day, the vocational expert who appeared at the ALJ hearing testified that a person who experienced these restrictions at work could not obtain employment. (Tr. 47.)

Despite this substantial evidence, which called for some analysis of the work preclusive nature of this restriction found by Seibert's treating doctor and confirmed by Seibert himself, the ALJ's decision contains no meaningful reference to this limitation. In fact, the decision does not speak to this restriction at all. In our view this was error, and error which calls for a remand. Further, we are not alone in this view. Quite the contrary, courts that have considered this precise issue routinely recognize that these conditions, and the necessity for a Social Security claimant to elevate his legs above his heart to combat edema, are factors which must be expressly examined and analyzed as part of a disability determination. Therefore, when an ALJ fails to address or analyze these restrictions a remand for further consideration of the evidence is often necessary. For example, in Mills v. Colvin, 959 F. Supp. 2d 1079, 1094 (N.D. Ill. 2013), the court was confronted with the same scenario presented

here: a disability claimant who was reportedly medically required to elevate his feet above his heart. As in this case, the ALJ in Mills failed to address this limitation in the decision denying benefits. The court found that this failure of articulation compelled a remand, stating in terms that are equally applicable here that:

> The ALJ's RFC assessment did not account for all of Plaintiff's limitations—specifically, it did not explain how Plaintiff's edema factored into the assessment or how the accompanying need to elevate his legs would affect his ability to perform light work. Plaintiff's edema was mentioned extensively in the record, and he was advised on more than one occasion to elevate his legs to relieve the accompanying swelling. (See, e.g., A.R. 301, 379, 702, 793, 796, 812.) Plaintiff's testimony that he elevates his feet a little bit higher than waist level to alleviate swelling is consistent with the medical evidence in the record. (A.R. 79–80). Because the ALJ's RFC did not consider the "aggregate effect" of Plaintiff's symptoms, specifically Plaintiff's edema, see Golembiewski, 322 F.3d at 918, and because he rejected the entire line of evidence pertaining to Plaintiff's need to elevate his legs, see Herron v. Shalala, 19 F.3d 329, 333 (7th Cir.1994), this Court cannot determine whether substantial evidence supports the ALJ's conclusion that Plaintiff can perform "light work" and must remand the RFC determination. On remand, the ALJ must consider the "entire constellation" of Plaintiff's ailments. See Golembiewski, 322 F.3d at 918. If the ALJ finds that Plaintiff's edema does not contribute to his limitations, he must explain why he finds Plaintiff's testimony and the medical evidence indicating his need to elevate his legs to be incredible.

Mills, 959 F. Supp. 2d at 1094.

Likewise, it has been held that when the residual functional capacity assessment formulated by an ALJ fails to take into account a treating physician's opinion that the plaintiff is required to elevate his legs, a remand is necessary to

further examine that treating source opinion and incorporate its limitations into an RFC assessment, if necessary. See Dillon v. Colvin, 210 F. Supp. 3d 1198, 1212 (D.S.D. 2016). Similarly, in the past, courts have often acknowledged the need for an ALJ to explicitly address any medical requirements that a plaintiff elevate his legs at work for prolonged periods. The need for this type of analysis by an ALJ was recognized by the court in Melendez v. Astrue, 630 F. Supp. 2d 308, 315 (S.D.N.Y. 2009), where the district court found that an ALJ's failure to address the claimant's need to elevate his legs throughout the day required a remand, stating that:

> [T]he ALJ ought to have acknowledged the matter and included it in his weighing of the evidence. The ALJ has a legal duty to adequately develop the record, Perez v. Chater, 77 F.3d 41, 47 (2d Cir.1996), and consider it in its entirety, 20 C.F.R. 404.1520(a)(3). It is grounds for remand "when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him." Lopez v. Sec'y of Dept. of Health and Human Servs., 728 F.2d 148, 150–51 (2d Cir.1984). The ALJ did not ask [plaintiff] any questions about his putative need to elevate his legs. He did not discuss it in his ruling either. While factual determinations are within the ALJ's competence, these determinations must be manifestly informed by the evidence. Sutherland v. Barnhart, 322 F.Supp.2d 282, 290 (E.D.N.Y.2004). By neglecting to mention this part of the record which may have influenced his conclusion, the ALJ committed legal error. The issue should be remanded for consideration of this omitted evidence.

Melendez, 630 F. Supp. 2d at 315. Simply put, it is well-settled that an inadequate discussion of the medical necessity for a disability claimant to elevate his legs for prolonged periods in order to combat edema, venous insufficiency, and neuropathy

is generally regarded as a material shortcoming in analysis by an ALJ and compels a remand. <u>See</u> <u>Lawson v. Barnhart</u>, 218 F. Supp. 2d 967, 972 (N.D. Ill. 2002).

Given this rising tide of case law addressing the precise situation presented in this case, we believe that the ALJ's failure to analyze, address or even acknowledge this body of evidence, which would preclude work if credited by the ALJ, leaves us unable to make an informed decision regarding whether the ALJ's decision is supported by substantial evidence since we cannot discern whether this evidence was discounted for "no reason or for the wrong reason." <u>Mason</u>, 994 F.2d at 1066. Accordingly, this shortcoming in the ALJ's articulation of the rationale for this decision  compels a remand of this case. Because we have found a basis for remand on these grounds, we need not address the plaintiff's remaining arguments. To the extent that any other error occurred, it may be remedied on remand. Finally, we note that nothing in this Report and Recommendation should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.  <u>Recommendation</u>

Accordingly, IT IS RECOMMENDED that the plaintiff's request for a new administrative hearing should be GRANTED, the final decision of the Commissioner denying these claims should be VACATED, and this case should be

**REMANDED** to the Commissioner to conduct a new administrative hearing pursuant to sentence four of 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 28th day of August 2019.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge